**Art ACEVEDO, Appellant,**

v.

**The CITY OF MUSKOGEE, a Municipal Corporation, Appellee.**

**No. 82396.**

Supreme Court of Oklahoma.

April 11, 1995.

Rehearing Denied June 21, 1995.

William H. Hinkle, Patricia Clifton Smith, Tulsa, for appellant.

Terrance Ball, Asst. City Atty., Muskogee, for appellee.

KAUGER, Vice Chief Justice:

■ A single issue is presented: whether the decision to terminate the appellant, Art Acevedo (Acevedo/detective/employee), satisfies the requirements established by the United States Supreme Court in *Connick v.*

*Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) for the dismissal of a public employee for exercising a First Amendment[1] right to speak. In *Connick*, the Supreme Court held that for a government employee's speech to be protected, it must: 1) encompass a matter of public concern; and 2) the employee's interest in expression must outweigh any injury the speech could cause to the interest of the state as an employer in promoting the efficiency of public services performed through its employees. We find that although the employee's speech encompassed a matter of public concern,[2] the potential injury to the City's ability to operate its police department outweighed the employee's interest in expression.

## FACTS

On January 7, 1992, the police chief, Gary Sturm (Sturm/police chief), of the appellee, City of Muskogee (City/employer), presented Acevedo with a "Notice of Hearing on Proposed Disciplinary Action." A pre-termination hearing was held before the Board of Supervisors composed of the police chief, the City's mayor and two police officers on January 13. Six officers were called to testify at the pre-termination hearing—one of these officers was called at Acevedo's suggestion. A "Notice of Termination" was issued to Acevedo on January 21. The termination notice delineated three reasons for his firing. The first reason involved conversations allegedly conducted by Acevedo with rookie officers accusing the police chief and other members of the law enforcement community of wrongdoing in a criminal case in which he asked the officers to document any impro-

---

1. The United States Const., amend. 1 provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

2. The City's brief acknowledges the public concern aspect of Acevedo's speech. It provides, in pertinent part, at p. 6:
   "... In Detective Acevedo's case, the City agrees that his speech can be fairly characterized as constituting speech on a matter of public concern. However, the manner in which he expressed himself disrupted the Mus-

kogee Police Department, undermined the authority of the Chief of Police, and destroyed the close working relationships required of the police department...."
   Speech on matters of public concern has been defined generally as speech relating to any matter of political, social or other concern to the community. *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983). Speech disclosing governmental wrongdoing or misconduct is generally of public concern. See, *Walter v. Morton*, 33 F.3d 1240, 1243 (10th Cir.1994); *Wulf v. City of Wichita*, 883 F.2d 842, 857 (10th Cir.1989).

prieties and to report directly to him rather than through the normal chain of command.[3]

3. Acevedo testified that these conversations did not take place. Another officer, testifying on Acevedo's behalf, said that he was with Acevedo when the alleged conversations took place. Nevertheless, the transcript testimony of Officer Johnson provides in pertinent part at pp. 8–11:

"A ... Mr. Acevedo drove up, asked me if I'd like to go get a cup of coffee; said sure. Went to McDonald's on South 32nd Street, had a hot cup of coffee, sat down and were talking. At that point, he asked me if I would be surprised to learn if we had a child molester on the police department....

Q What else did your conversation entail?

A He said that—upon telling me this, I'd always wondered what happened to Officer [D. A.] who used to be the public relations officer. I asked him what had happened to him and he told me he had been forced to resign for being a child molester....

Q Was there any other conversation?

A Yes, sir. He said there were crooked cops on the Muskogee Police Department if I'd be surprised to know about it. I said, yes, I would. He said, by and large it was a good department, but there were crooked cops on it. He could fit them into the back of a patrol unit, but they were here. At this point I asked him about the Flusche–Gaston case that happened at the chili cookoff, at the festival cookoff. There was a lot of interest in it a few years back. It was in the paper a lot. He said that in that case, the Chief either switched or had the alleged cocaine switched in our evidence room at the Muskogee Police Department.

An he went through a list of people who had access to the evidence room, which was the Chief, Captain Franks, Lieutenant McDaniel, Sergeant Brook, Frank Inlaw. Said Frank Inlaw wouldn't have done this, had anything to do with this. All these people owed their current rank and title to the current administration we have now, and it was a cover-up because of pressure from the DA. The DA is really the one the Chief owed his job to because he's the one that put the Chief into office.

He had stated that he tried to go to Major Eskridge with cases on wrongdoings by cops here in Muskogee and the Major told him if he didn't stop, that he would fire him. He stated to me he was recording this conversation and if the Major tried to fire him, he would be the richest cop in Muskogee because he would take him to the Supreme Court.

He had also said he would try to file cases with the DA before, but the DA would not take them because of his close ties with the Chief. He stated he never said anything around Corporal Caywood because he would run straight to the Chief.

Q Is there anything else that you can recall about that conversation?

A We went back to the Police Department as we were—well, went back, going back to the police department and he said if I saw any wrongdoings, anything was out of order, to write it down, to document it, and when I got my year in, we would get together and he would show me the information that he had on people. I could show him what I had...."

Officer Martin's testimony appears pp. 19–22 of the transcript. It provides in pertinent part:

"... A I was training Officer Johnson at the time, infield training.

We went to lunch about approximately seven o'clock, we was sitting there eating. I noticed that Officer Johnson had been thinking about something, he was upset. I was—we had a conversation started about the Police Department. He asked questions such as, why couldn't everybody get along, why certain officers had problems with each other. I explained, I said, this is a job just like every place else, everybody has their problems, so on. Don't be worried about it, just do your job and go on.

Then he asked if I knew if there was a child molester working for the Police Department. At that time, I was shocked that he would even say anything to that extent and the conversation—I asked him where he heard that from. He was tight-lipped about it. He didn't say anything about it at all....

I then—he came up with a discussion about the Gaston case in which he believed that he had been told that someone had switched, directive from the Chief, switched the cocaine, supposed, cocaine that was in evidence, and had changed it and had been directed either by the Chief or the Chief had done it himself. ... After that conversation I left and I had told him, I said, let me guess who I thought that that was that told him this stuff and I said, Art Acevedo. And he said, yes, that's who....

Q Why were you able to guess it was Art Acevedo?

A During the time when I was in my rookie state through my career, I had been approached by Art Acevedo and had been told similar things that a rookie had discussed about, about the rumors, about certain officers, bad officers that was in the Department, rumors such as of a certain captain that had been, worked up on the jail and there was a sexual misconduct with other, a female prisoner up in the jail. There has been accusations of captains leaning toward Art Acevedo. He was telling me about he had documentation and tapes, so forth and so on that way.

And that's, it got to a point where it was continual where he was working in with the Department, that I just got to the point where I didn't—I tried to avoid the discussions such as that with Art. So I tried to stay away as much as possible with Art.

Q Did he ever have a conversation with you or your father regarding what was going on?

A Well, there was certain things Art had went to my father and discussed how that I had

The second ground concerned a letter Acevedo admitted sending to a Washington, D.C. NAACP attorney in which members of the legal community were charged with committing criminal acts, covering up crimes and accusing the officials of discrimination.[4] The police chief indicated that the attitude expressed in the letter caused him to believe that he and the command staff could not place confidence in Acevedo or expect loyalty from him. The third basis for the dismissal was founded on an admission that the employee had furnished police reports to the NAACP attorney. The police chief argued that these reports contained confidential notes taken by investigative officers.

The termination notice stated that Acevedo's actions violated the Rules of Conduct outlined by the Muskogee Police Department's Policy and Procedures Manual[5] and Rule X of the of the City's Merit System Rules.[6] Specifically, Acevedo was found to have violated the general rules of conduct of the police department by: acting in a manner unbecoming to an officer; disseminating confidential police department records; and violating or encouraging others to violate the normal chain of command. The alleged violation of the merit system rule related to conduct found discreditable to the service—engaging in activities disruptive to the order and discipline of the City and participating in malicious gossip or other activities bringing disrepute on the City.

Acevedo appealed to the City's Merit Board (Board) arguing that he was not discharged for the reasons given by the chief of police in his termination letter. Rather, Acevedo argued that he was fired for testify-

some abilities and how I thought that—he thought that I could go far. I had been approached by Art, you know, that if I had documented everything, he would remember things, people that would help him—that people that had helped him document things, that whenever he was in a position, maybe I would be able to get wherever I wanted to go, certain positions, such as investigations or in that degree, if he ever was able to get administration...."

4. These charges were leveled against the police chief, two former chiefs, an FBI agent, two former district attorneys, two United States Attorneys, the district attorney and a former district attorney.

5. Muskogee Police Department, Policy and Procedures Manual (12/1/88) provides in pertinent part:

"... A. *Rules of Conduct*
1. Violation of Rules
Officers shall not commit any acts or omit any acts which constitute a violation of any of the rules, regulations, directives or orders of the department whether stated in this General Order or elsewhere.
2. Unbecoming Conduct
Officers shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the department. Conduct unbecoming an officer shall include that which brings the department into disrepute or reflects discredit upon the officer as a member of the department, or that which impairs the operation or efficiency of the department or officer....
34. Dissemination of Information
Officers shall treat the official business of the department as confidential. Information regarding official business shall be disseminated only to those for whom it is intended, in accordance with established departmental procedures. Officers may remove or copy official records or reports from a police installation only in accordance with established departmental procedures. Officers shall not divulge the identity of persons giving confidential information except as authorized by proper authority....
*ORGANIZATIONAL POLICIES*
*Organizational Policies:* To provide a guide for future action in organizational planning, it is the policy of the Muskogee Police Department to:
... Have established lines of authority followed in all routine matters. It is not the purpose of this policy, however, to put an end to the 'open door' policy. When normal lines of authority do not suffice, persons are encouraged to seek advice and discuss problems with higher authority...."

6. Rule X, City of Muskogee, Oklahoma, Merit System provides in pertinent part:

"... *Section 3. Causes for Suspension and Dismissal.* The causes for suspension and dismissal shall be disability, wilful disobedience, inefficiency, conduct discreditable to the service, or the commission of any of the following prohibited acts:
No employee of the classified service of the City of Muskogee:
... 11. Conduct discreditable to the service:
... (b) No employee shall conduct himself in a manner, or be a part to any act, which would tend to impair the good orders and discipline of the City.... (h) No employee shall be a party to any malicious gossip, or activity which would tend to disrupt the department or bring discredit to the City...."

ing before the grand jury investigating corruption in the police department. A hearing was held on March 4, 1992. At the hearing, two officers testified: that Acevedo had approached them early in their careers with the police department; that he had made charges of improprieties against the police chief and other law enforcement officials and members of the legal community; and that he had encouraged them to record and report any irregularities in police department procedures to him rather than through the normal chain of command.[7] The testimony of one of these officers was controverted by a detective who worked with Acevedo. He alleged that he had been with Acevedo during the week that one of the conversations was supposedly conducted. The detective testified that the discussion couldn't have taken place because he was with Acevedo throughout the week, and that there had not been any contact between the detective and the police officer.

The investigation involving Acevedo's conduct was conducted from August 1, 1991, through January 13, 1992. During this time, a grand jury was convened to investigate corruption in the police department. It is undisputed that Acevedo testified before the grand jury. However, no charges were brought against the police chief as a result of the grand jury proceedings. Other than his own testimony, Acevedo did not present any evidence that his firing was in retaliation for his testimony. Acevedo's allegation of discrimination was not substantiated by the evidence.

The police chief testified that during the investigation leading up to Acevedo's firing, he interviewed all eighteen rookie officers employed by the City. Two officers, who were interviewed separately, told almost identical stories about Acevedo's attacks on the law enforcement and legal communities.

Each of these officers told the police chief that Acevedo had encouraged them to keep track of any wrongdoing within the department and to report directly to him. The police chief told the Board that he did not institute termination proceedings against Acevedo during the term of the grand jury because he had no desire to interfere with the detective's participation in the proceedings. At the conclusion of the hearing, the Board upheld Acevedo's termination.

On appeal, the Court of Appeals found that: 1) the employee's termination was supported by the clear weight of the evidence; and 2) Acevedo's right to free speech had not been unconstitutionally restricted. We granted certiorari on December 15, 1994, to consider a single issue—to determine whether the employee's termination conforms with the test set out by the United States Supreme Court in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

## ALTHOUGH THE EMPLOYEE'S SPEECH ENCOMPASSED A MATTER OF PUBLIC CONCERN, THE POTENTIAL INJURY TO THE CITY'S ABILITY TO OPERATE ITS POLICE DEPARTMENT OUTWEIGHED THE EMPLOYEE'S INTEREST IN EXPRESSION.

■ Acevedo argues that under the Supreme Court's recent pronouncement in *Waters v. Churchill*, —— U.S. ——, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), the Board was required to find that the police chief reasonably and honestly believed that his speech was unprotected before it could uphold his termination. However, *Waters* is a plurality opinion.[8] Therefore, we rest our pronounce-

7. See notes, 3, supra & 16, infra.

8. On certiorari, the employee urged us to apply the recently announced test of *Waters v. Churchill*, —— U.S. ——, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). *Waters* reaffirmed the test announced in *Connick v. Myers*, see note 2, supra, that for a government employee's speech to be protected, it must encompass a matter of public concern and the employee's interest in expres-

sion must outweigh any injury the speech could cause to the interest of the state as an employer in promoting the efficiency of public services performed through its employees. *Waters* also requires the government employer to conduct a reasonable investigation before an employee is punished for speech. We note that *Waters* is a plurality opinion. [Opinion by O'Conner, J., in which Rehnquist, C.J., and Souter and Ginsburg, J.J. joined.] Although we do not today embrace

ment today upon the prior Supreme Court precedent announced in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

The United States Supreme Court established the test in *Connick* for determining whether speech by a government employee may, consistently with the First Amendment, serve as a basis for disciplining or discharging that employee. In *Connick*, the United States Supreme Court held that for a government employee's speech to be protected, it must encompass a matter of public concern and the employee's interest in expression must outweigh any injury the speech could cause to the interest of the state as an employer in promoting the efficiency of public services performed through its employees.

The First Amendment [9] protects speech by public employees which touches on matters of public concern.[10] Although the government as an employer has broader powers concerning its employees' speech than the

government as sovereign has respecting the speech of citizens,[11] a government agency may not discharge an employee on a basis which infringes that employee's constitutionally protected interest in free speech.[12]

The threshold question in determining whether a discharge impermissibly infringed upon the employee's First Amendment rights under *Connick* is whether the employee's speech related to a matter of public concern. Here, the City concedes this issue. It recognizes that Acevedo's allegations of corruption in the law enforcement and legal community are matters concerning the public interest.[13] Therefore, we must address the second part of the *Connick* inquiry—whether the employee's interest in expression outweighs any injury the speech could cause to the interest of the state as an employer in promoting the efficiency of public services performed through its employees.

In *Connick*, a former assistant district attorney brought a civil rights action in which

the additional requirement announced in *Waters*, we note that, under the facts presented, the employer met the *Waters* requirement for a reasonable investigation.

In *Waters*, a nurse was supposedly fired for statements she made to a cross-trainee about how bad things were in the obstetrics department. The cross-trainee testified that these statements caused her not to request a transfer to the obstetrics department. Another employee called the statements "unkind and inappropriate," and a third person stated that it would be impossible to "wipe the slate clean" considering the statements made. The Supreme Court found that these statements were sufficient for management to doubt the nurse's future effectiveness. In balancing the employee's interest in protected speech against the potential disruptiveness of the speech to the hospital, the Supreme Court found that the management reasonably believed the potential disruptiveness of the speech was enough to outweigh whatever First Amendment value the speech might have had as a matter of law.

In *Waters* the government employer conducted a reasonable investigation before the employee was punished for her speech. The Supreme Court found the government employer's investigation in *Waters* was reasonable because the employer interviewed the party to whom the disruptive statement was made, confronted the parties who overheard the statement, and discussed the statement with the discharged nurse. Here, the police chief interviewed all eighteen rookie officers. Although Acevedo presented one witness who said that one of the officers could not have spoken with the detective during the week in ques-

tion, the two other officers told almost identical stories in separate interviews. The police chief stated his reason for believing one officer over another. The scope of the investigation in *Waters* supported the Court's finding that the employer's belief was reasonable. Under *Waters*, "[o]nly procedures outside the range of what a reasonable manager would use may be condemned as unreasonable." The investigation undertaken here is virtually identical to the one approved in *Waters*.

9. The United States Const., amend. 1, see note 1, supra.

10. *Waters v. Churchill*, see note 8, —— U.S. at ——, 114 S.Ct. at 1884, supra; *Rankin v. McPherson*, 483 U.S. 378, 393, 107 S.Ct. 2891, 2901, 97 L.Ed.2d 315 (1987); *Connick v. Myers*, see note 2, 461 U.S. at 143–46, 103 S.Ct. at 1688–89, supra; *Pickering v. Board of Education*, 391 U.S. 563, 572–74, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968).

11. *Waters v. Churchill*, see note 8, —— U.S. at ——, 114 S.Ct. at 1886, supra; *Connick v. Myers*, see note 2, 461 U.S. at 148–52, 103 S.Ct. at 1691–92, supra.

12. *Rankin v. McPherson*, see note 10, 483 U.S. at 382–83, 107 S.Ct. at 2896; *Connick v. Myers*, see note 2, 461 U.S. at 141–42, 103 S.Ct. at 1687, supra; *Pickering v. Board of Education*, see note 10, 391 U.S. at 572–74, 88 S.Ct. at 1737, supra.

13. See note 2, supra.

she contended that her employment was terminated because she exercised her constitutionally guaranteed right of free speech. The discharge was found not to violate the attorney's right of free speech where when her transfer was recommended, she strongly opposed the transfer, expressing her views to several of her supervisors. She then prepared a questionnaire which she distributed to other attorneys concerning office transfer policy, office morale, need for a grievance committee, level of confidence in supervisors and whether employees felt pressure to work in political campaigns. Except for the question regarding pressure upon employees to work in political campaigns, the Supreme Court found that the questionnaire did not fall under the rubric of matters of public concern.

Here, two officers testified that Acevedo asked them to break the chain of command by reporting any instances of perceived wrongdoing to him rather than to their supervisors.[14] In exchange for these documented reports, Acevedo indicated that the officer's careers would be advanced.[15] One of the officers told the Board that he began to avoid Acevedo because these conversations were affecting his attitude towards the police department.[16] These statements, like the actions reviewed in *Connick*, indicate that Acevedo's speech was highly disruptive to the operation of the police department. In balancing Acevedo's interest in protected speech against the potential disruptiveness of the speech to police department operations, we find that the department reasonably and in good faith believed Acevedo should be terminated for his disruptive speech.[17]

## CONCLUSION

This Court will not hesitate to protect an employee's right to free speech whether raised under the First Amendment or under art 2, § 22 of the Oklahoma Constitution.[18] However, a single issue is presented—the effect of the United State Supreme Court's decision in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) upon the Board's decision to uphold Acevedo's termination. We find that the *Connick* standards were met. The clear weight of the evidence [19] supports a finding that Acevedo encouraged other officers to violate departmental rules and that Acevedo's speech was

14. This recommendation directly conflicted with the Muskogee Police Department, Policy and Procedures Manual (12/1/88), *ORGANIZATIONAL POLICIES*, see note 5, supra.

15. See, footnotes 3, supra & 16, infra.

16. The transcript testimony of Officer Martin provides in pertinent part at pp. 23:

"... Q You said it got to the point where it was continual. By that, did you mean to imply that any time you had a conversation with Detective Acevedo, he was talking about corruption in the Police Department?
A Just about, about every time. He would ask to go to coffee, I'm saying around '88, I can't—so many conversations. When he came back to patrol, it came to the point where it was, we would go, he would want to go out for a cup of coffee and we would talk about other officers. I talked about fishing and cars, then with Art it got to the point where it was real quick about—all the men-talk that I would say, you know, other officers and I do, and then it was, I mean, bam, you're right into the corruption of the Police Department, Chiefs of Police, you know, cover-ups and corruption in the Department.
It got to be the point with where it was just continual over and over. It got sickening to me because I was trying to keep a good atti-
tude about the Police Department and it just was continual...."

17. Because Acevedo's statements to other police officers were sufficiently disruptive to support his termination, we do not address the issue of whether the letter Acevedo admitted sending to the Washington, D.C. NAACP attorney or the disclosure of supposedly confidential police reports attached to that letter would have been sufficient, in themselves, to have outweighed the employee's First Amendment right of free speech.

18. The Okla. Const., art. 2, § 22 provides:

"Every person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions for libel, the truth of the matter alleged to be libelous may be given in evidence to the jury, and if it shall appear to the jury that the matter charged as libelous be true, and was written or published with good motives and for justifiable ends, the party shall be acquitted."

19. *City of Muskogee v. Grayson*, 818 P.2d 491, 493 (Okla.1991).

discouraging to a fellow police officer. Although the employee's speech encompassed a matter of public concern, the potential injury to the City's efficient administration of its police department outweighed the employee's interest in expression.

**CERTIORARI PREVIOUSLY GRANTED; COURT OF APPEALS OPINION VACATED; TRIAL COURT AFFIRMED; MERIT BOARD SUSTAINED.**

ALMA WILSON, C.J., and HODGES, LAVENDER, SIMMS, HARGRAVE, OPALA and WATT, JJ., concur.

CHAPEL, Special Judge, concurs in judgment, sitting in lieu of SUMMERS, J., who certified his disqualification.

OPALA, Justice, concurring.

Today's opinion holds that because his disruptive statements are unprotected by the First Amendment to the United States Constitution, Art Acevedo's [Acevedo] dismissal from employment by the City of Muskogee [City] was not in breach of his right to free speech.[1] The court *correctly* applies a First Amendment balancing test and notes that *Waters v. Churchill* was decided by a *plurality*.[2] I agree that Acevedo's First Amendment right to communicate matters of public concern was outweighed by the City's interest, *qua* employer, in promoting the efficiency of its police department.[3] The pronouncement rests upon the standards of *Connick v. Myers*,[4] the U.S. Supreme Court's *last precedential pronouncement* on the subject, which articulates the federal-law test still in force today.[5] *When measured by Connick, Acevedo's discharge is not constitutionally offensive.* I hence concur in the court's opinion but write separately to explain why *Waters* may not guide our consideration of Acevedo's claim and to comment on his failure to press the protections afforded by this *State's* free-speech guarantee, Art. 2, § 22, Okl. Const. Inasmuch as neither *party* invoked the provisions of § 22,[6] I would decide this case *solely* on First Amendment grounds.

**I**

**THE ANATOMY OF LITIGATION**

Acevedo was dismissed, *after* a pretermination hearing, from his job as a detective in the City's police department. The employment termination was grounded on certain statements Acevedo had made to junior officers, intimating misconduct and widespread corruption in the department. It was the City's position that these comments and accusations breached department and merit system rules and undermined the morale as well as effectiveness of the force. Acevedo appealed to the City Merit System Board [Board], which upheld his dismissal. He

1. Amend. 1, U.S. Const., provides in pertinent part:
   "Congress shall make no law ... *abridging the freedom of speech* ...." (Emphasis added.)
   Freedom of speech is among the fundamental personal rights and "liberties" protected from state impairment by the Due Process Clause of the Fourteenth Amendment. *Gitlow v. People of the State of New York*, 268 U.S. 652, 666–68, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1924); *Stromberg v. People of the State of California*, 283 U.S. 359, 366–69, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931).

2. 511 U.S. ——, ——, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994) (opinion by O'CONNER, J., in which REHNQUIST, C.J., and SOUTER and GINSBURG, JJ., joined).

3. *See Pickering v. Board of Ed. of Township High School Dist.*, 391 U.S. 563, 569–70, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968).

4. 461 U.S. 138, 141–42, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983).

5. *Connick*, 461 U.S. 138, 103 S.Ct. 1684, *supra* note 4 at 141–42, 103 S.Ct. at 1687 (citing, *Pickering*, 391 U.S. 563, 88 S.Ct. 1731, *supra* note 3 at 566–68, 88 S.Ct. at 1734). *See also United States v. National Treasury Employees Union*, —— U.S. ——, ——, 115 S.Ct. 1003, 1018, 130 L.Ed.2d 964 (1995), where the Court invoked the *Connick* balancing test to *void* a regulation proscribing federal employees' acceptance of honoraria for public speeches.

6. Art. 2, § 22 Okl. Const., provides in pertinent part:
   "Every person may freely *speak*, write, or publish his sentiments *on all subjects* ...." (Emphasis added.)
   *See State ex rel. Dept. of Transp. v. Pile*, Okl., 603 P.2d 337, 340, 341 (1979); *Hennessey v. Independ. Sch. Dist. No. 4, Lincoln Cty.*, Okl., 552 P.2d 1141, 1144 (1976), *cert. denied*, 453 U.S. 922, 101 S.Ct. 3158, 69 L.Ed.2d 1004 (1981).

sought district court review, urging he had been fired for engaging in constitutionally protected speech. The trial court affirmed the Board's decision. The Court of Appeals ruled that Acevedo's free-speech rights had not been unconstitutionally infringed.[7]

## II

### THE *WATERS* "REASONABLE INVESTIGATION" ELEMENT

*Connick* teaches that for government employee speech to be protected by the First Amendment, the employee's interest in expressing himself (or herself) *on a matter of public concern* must *not* be *outweighed* by the government's own interest in promoting the efficiency of public services rendered through its employees.[8] The *Waters* plurality held that *in pretermination stages* the government employer must conduct a probe to ascertain if the First Amendment's mantle extends to the offending employee's utterances in controversy and to *make its inquiry part of the documentation that is to accompany the dismissal action.*[9] The discharge

record so compiled must reveal the employer had pressed a *reasonable inquiry* and came to be objectively satisfied that its dismissal action *would not violate* First Amendment guarantees. The four-member plurality who endorsed the *addendum* calling for a pre-dismissal internal inquiry rested the *new* requirement on a need to ensure proper *procedural* safeguards in the critical pre-termination stage.[10] I concur in the court's conclusion that Acevedo's communications here in contest underwent a pre-discharge investigation that meets the *extraconstitutional*[11] *Waters* plurality test.

## III

### ACEVEDO CANNOT SECURE THIS COURT'S REVIEW BASED ON THE *WATERS* PLURALITY STANDARDS

Although Acevedo *sought a review upon the Waters' standards*, we cannot comply with his request. Were we to follow that plurality opinion we would be impermissibly *dichotomizing* federal law within this State.[12]

---

7. The Court of Appeals invoked *sua sponte* and then held unavailable the protections of Art. 2, § 22 Okl. Const., *supra* note 6.

8. *Connick*, 461 U.S. 138, 103 S.Ct. 1684, *supra* note 4 at 141–42, 103 S.Ct. at 1687 (citing *Pickering*, 391 U.S. 563, 88 S.Ct. 1731, *supra* note 3 at 567–68, 88 S.Ct. at 1734).

9. *Waters*, 511 U.S. ——, 114 S.Ct. 1878, *supra* note 2 at ——, 114 S.Ct. at 1889.

10. *Id.* at ——, 114 S.Ct. at 1884.

11. *Waters*, 511 U.S. ——, 114 S.Ct. 1878, *supra* note 2 at ——, 114 S.Ct. at 1895 (SCALIA, J., with whom KENNEDY, and THOMAS, JJ., joined, concurring in judgment). Justice Scalia's separate writing decried the plurality's creation of an internal investigation requirement, arguing that it would impose an unworkable burden upon public employers. It also *expressly disavowed* the plurality's notion that, before terminating the employee, the government employer must "reasonably believe" that the employee's implicated speech is unprotected.
"*Judicial* inquiry into the genuineness of a public employer's *asserted justification* for an employment decision—be it unprotected speech, general insubordination, or laziness—*is all that is necessary* to avoid the targeting of

"public interest" speech.... Our cases have *hitherto* considered this sort of inquiry all the protection needed." (Emphasis added.) *Waters*, [511 U.S. ——], 114 S.Ct. 1878, *supra* [at ——, 114 S.Ct.] at 1895 (SCALIA, J., with whom KENNEDY, and THOMAS, JJ., joined, concurring in judgment), citing *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

12. Absent any United States Supreme Court pronouncement, we follow *as a matter of comity* the substantive federal law decisions by the United States Court of Appeals for the Tenth Circuit and that court's constitutional jurisprudence applicable to the states. *Phillips v. Williams*, Okl., 608 P.2d 1131, 1135 (1980), *cert. denied sub nom.*, 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980). *See also Lepak v. McClain*, Okl., 844 P.2d 852, 860 n. 8 (1980) (Opala, V.C.J., concurring in result); *McLin v. Trimble*, Okl., 795 P.2d 1035, 1047 n. 17 (1990) (Opala, V.C.J., dissenting); *Blanton v. Housing Authority*, Okl., 794 P.2d 412, 418 n. 5 (1990) (Opala, V.C.J., concurring in judgment). The voluntary deference we pay to our circuit's jurisprudence prevents federal law within the State of Oklahoma from becoming dichotomized into *one* corpus of norms administered by federal courts sitting within this State and *another* body of precepts to be followed in Oklahoma state courts.

No plurality opinion is *precedential.*[13] It represents a minority view with *no* binding effect either for the federal- or the state-court systems.[14] This court's pronouncements of federal law must never vary, however slightly, from precedential U.S. Supreme Court jurisprudence. *In short, Waters may neither influence nor govern our exposition of federal constitutional law.* Today's opinion avoids this pitfall by faithfully tracking *Connick,* which controls this case.

## IV

### ACEVEDO CANNOT SECURE THIS COURT'S REVIEW ON THE STANDARDS OF ART. 2, § 22 OKL. CONST.[15]

Had Acevedo raised *any* state constitutional argument, I would not be hesitant today to adopt an *expanded* version of the *Waters* plurality command as this State's prophylactic rule of due process under Art. 2, § 7 Okl. Const.,[16] to be engrafted upon the free-speech guarantee of Art. 2, § 22 Okl. Const., which would provide *added* protection for state and local government employees

against constitutionally impermissible dismissal, based solely on speech, by mandating a pre-discharge (or pre-suspension) *adversary administrative* hearing to be held before a neutral and detached agency official.[17] In *Branti v. Finkel*[18] the Court emphasized that before terminating an employee who claims First Amendment protection the government must demonstrate some *overriding interest* of *vital importance* in maintaining its efficiency, which outweighs any benefit to be derived from free speech.[19] I would put the State under like burden when the § 22 free-speech guarantee is invoked.

I would additionally observe that in administering the *State's* fundamental law the employee's often *undisciplined* conduct (in breach of internal regulations) must *never be overfocused.* Having to retain in public employment an *impatient,* though *thoroughly principled* "busybody loudmouth"—one with great zeal to expose covert wrongdoing—is not too large a price to pay for a *genuinely* valuable contribution to *unmasking* and *rectifying* political corruption. In the defense of government's legitimacy *some degree* of individual insubordination should be forgiva-

13. By force of the Supremacy Clause, Art. 6, cl. 2, U.S. Const., state courts are bound by the U.S. Supreme Court's jurisprudential exposition of federal law. *See United States v. Home Federal S. & L. Ass'n of Tulsa,* Okl., 418 P.2d 319, 325 (1966); *Dean v. Crisp,* Okl.Crim., 536 P.2d 961, 963 (1975).

14. Though a ruling by a divided U.S. Supreme Court is conclusive for the parties then before it, the opinion is *not* authority for the resolution of *any* other cases *either in that court or in any inferior court. No* opinion garnering fewer than five votes can be considered precedential authority. *See United States v. Friedman,* 528 F.2d 784, 788 (10th Cir.1976), citing *Hertz v. Woodman,* 218 U.S. 205, 213–16, 30 S.Ct. 621, 623, 54 L.Ed. 1001 (1910); *United States v. Pink,* 315 U.S. 203, 214–16, 62 S.Ct. 552, 558, 86 L.Ed. 796 (1942); *see also in this connection,* John F. Davis & William L. Reynolds, *Juridical Cripples: Plurality Opinions in the Supreme Court,* 1974 Duke L.J. 59; Note, *Plurality Decisions and Judicial Decisionmaking,* 94 Harv.L.Rev 1127 (1981); Note, *The Precedential Value of Supreme Court Plurality Decisions,* 80 Colum.L.Rev. 756 (1980).

15. Art. 2, § 22 Okl. Const., *supra* note 6.

16. Art. 2, § 7 Okl. Const. provides:

"No person shall be deprived of life, liberty, or property, *without due process of law.*" (Emphasis added.)

17. *See in this connection Gagnon v. Scarpelli,* 411 U.S. 778, 785–788, 93 S.Ct. 1756, 1761–1762, 36 L.Ed.2d 656 (1973), where the Court provided a similar safeguard to govern parole revocation, and *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 545–546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985), where the Court gave a *tenured* public employee the opportunity to present his (or her) side of the case *before* a permissible suspension awaiting termination may be effected. Important government interests would be advanced by requiring full-scale adversary process of administrative law to be utilized as a vehicle for separating *legitimate whistleblowers* from *chronic or malcontent troublemakers.*

18. 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

19. *Branti,* 445 U.S. 507, 100 S.Ct. 1287, *supra* note 18 at 514–16, 100 S.Ct. at 1293. *See also Elrod v. Burns,* 427 U.S. 347, 362–63, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976) (opinion by BRENNAN, J., in which WHITE and MARSHALL, JJ., joined); *Perry v. Sindermann,* 408 U.S. 593, 596–97, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

ble. There are ways to deal with it *other* than through ridding the workplace of those often conscientious and idealistic individuals who show *little or no* tolerance for questionable practices of officialdom. In their day-to-day venue, whistleblowers may seldom be the most admired people, but the cold neutrality of *our* balancing process will not allow their *value* to be diminished or ignored. The law must be ever mindful that the people as a whole reap a very significant benefit from human efforts that persuade or coerce government to *abandon lawlessness* and resume a law-charted course of operational management. Nothing less will do in a Nation like ours which takes enormous pride in its commitment to the rule of law. Unlike the present-day federal law, our own jurisprudential exposition of Art. 2, § 22 Okl. Const. should not be inhospitable to free-speech protection for public employee utterances legitimately connected with uncovering or targeting clandestine government operations of a legally-clouded nature. The State's public policy weighs heavily against impunity for official wrongdoers.[20] Nor does it approve of chilling that free speech which would put a premium on government secrecy.

## V

### SUMMARY

The court is correct in measuring Acevedo's rights by reference to precedential federal case law and in upholding his dismissal. Its decision, which is *entirely consistent* with the *Connick* balancing-of-interests test, rightly notes that this State is not bound by the *Waters* plurality's call for a documented internal pretermination inquiry. *Waters,* which garnered only four votes, is *not entitled to this court's obedience as a binding federal-law norm.* Federalism does not require us to adopt standards more generous

---

**20.** The provisions of 74 O.S.1991 § 841.7 state in pertinent part:

"Disciplinary actions ... shall *not* be taken against an employee for providing or offering to provide information or for communicating to others any *substantiated* claim of wrongdoing by or within a state agency." (Emphasis added.)

*See in this connection Vannerson v. Bd. of Regents of U. of Okl.,* Okl., 784 P.2d 1053, 1055 (1989);

than those of *Connick.* Had Acevedo, at some critical stage of this case, invoked *state* constitutional rights, I would today *extend* to him the opportunity for a full-scale administrative adversary pretermination hearing at which the State would be called upon to demonstrate some *vital overriding interest* that would clearly outweigh Acevedo's First Amendment claim in a matter of public concern.

CHAPEL, Special Judge, concurring in the judgment.

I concur in the Court's decision that Art Acevedo's First Amendment interest in expression was outweighed by the potential injury to the City of Muskogee. I write separately because I come to this conclusion after analyzing the case under the requirements of *Connick v. Myers*[1] as refined in *Waters v. Churchill.*[2] I believe the facts here show that the Muskogee Police Department reasonably believed in potential injury to the Department as a consequence of Acevedo's speech and was justified in dismissing him on that basis.

*Connick* set forth the test for determining whether speech by a government employee may serve as a basis for discipline or discharge. To be protected, the speech must be on a matter of public concern, and the employee's interest in expression on the matter must not be outweighed by any injury the speech could cause the interest of the State in promoting the efficiency of the public services it performs through its employees. This test must be applied to the facts of each case. *Waters v. Churchill* clarifies whether the *Connick* test should be applied to what the government employer thought was said, or to what the trier of fact ultimately determines to have been said. *Waters* determines that the *Connick* test should be applied to

---

*Burk v. K–Mart Corp.,* 956 F.2d 213, 214 (10th Cir.1991).

**1.** 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

**2.** 511 U.S. ——, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).

the facts as the employer reasonably found them to be.[3] The plurality opinion in *Waters* also indicated that the employer must engage in some investigatory procedure, to be evaluated on a case-by-case basis, in arriving at a reasonable belief.[4] While it is clear from the opinion that some procedure must justify an employer's "reasonable" belief regarding employee speech, the suggested requirement for an investigation is not the heart of the opinion. *Waters'* importance lies in its determination of how facts are to be determined under *Connick*.

The majority and concurring opinions decline to apply *Waters* because it was decided by a plurality.[5] I agree that a plurality decision is binding precedent only as to identical fact situations which would result in the same judgment. However, any plurality decision may be persuasive. Moreover, I cannot agree that a plurality decision has no binding effect. Lower state and federal courts must frequently parse the opinions included in plurality decisions to determine whether a decision contains any common statement of law, or reaches a common result, which can and should be applied in future cases.[6] Rather than reflexively abandoning *Waters* this Court should determine whether the decision has any precedential value.[7]

My analysis of the various *Waters* opinions reveals a common principle. As Justice Souter explicitly notes in his concurrence, a clear majority supports the plurality opinion's determination that the *Connick* test should be applied to the facts as the employer believed them to be and the plurality's requirement that an employer reasonably believe the employee could be punished for the offending speech.[8] Justice Scalia's opinion concurring in result quarrels only with the plurality's suggested requirement for some sort of procedural investigation and would hold the employee's First Amendment rights are adequately protected by determining whether a discharge was a pretext masking an impermissible purpose.[9] This opinion rejects only the plurality's procedural requirements, not the basic requirement that an employer have a reasonable belief that the employee may be dismissed for his speech. As Justice Souter notes, employers whose conduct survives the plurality's reasonableness test cannot be held liable under Justice Scalia's formulation.[10] Justice Stevens insists the plurality goes too far in allowing employers to dismiss employees who engage in protected speech if the employers have a reasonable belief the speech is not protected, and would have the trier of fact rather than the employer determine what was actually said.[11] As Justice Souter notes, this opinion

3. *Waters*, 511 U.S. at ——–——, 114 S.Ct. at 1888–1889, 128 L.Ed.2d at 700–701.

4. *Waters*, 511 U.S. at ——, ——, 114 S.Ct. at 1886, 1889, 128 L.Ed.2d at 697, 701.

5. Three Justices joined Justice O'Connor's plurality opinion, one Justice also concurred separately, three Justices concurred in result, and two Justices dissented.

6. John F. Davis & William L. Reynolds, *Juridical Cripples: Plurality Opinions in the Supreme Court*, 1974 Duke L.J. 59; Note, *Plurality Decisions and Judicial Decisionmaking*, 94 Harvard L.Rev. 1127 (1981); Note, *The Precedential Value of Supreme Court Plurality Decisions*, 80 Colum.L.Rev. 756 (1980). *Cf. United States v. Friedman*, 528 F.2d 784, 788 (10th Cir.1976), citing *Hertz v. Woodman*, 218 U.S. 205, 30 S.Ct. 621, 54 L.Ed. 1001 (1910) (lower court need not follow rule promulgated by only three Justices); *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942) (affirmance by equally divided court not authoritative precedent).

7. In the Court's most recent case on the issue of employee speech, the six-Justice majority, the concurring opinion, and the dissenting opinion all cite *Waters* as persuasive authority. *United States v. National Treasury Employees Union*, —— U.S. ——, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995).

8. *Waters*, 511 U.S. at ——, 114 S.Ct. at 1893, 128 L.Ed.2d at 706 (Souter, J., concurring).

9. *Waters*, 511 U.S. at ——, ——–——, 114 S.Ct. at 1893, 1895–96, 128 L.Ed.2d at 706, 709–10 (Scalia, J., concurring in result).

10. *Waters*, 511 U.S. at ——, 114 S.Ct. at 1893, 128 L.Ed.2d at 706 (Souter, J., concurring).

11. *Waters*, 511 U.S. at ——, ——, 114 S.Ct. at 1898, 1900, 128 L.Ed.2d at 712, 714 (Stevens, J., dissenting).

offers a lowest common denominator for the plurality's reasonableness test, since, no matter who determines what was said, an employer who fails the reasonableness test must be held liable under the First Amendment.[12]

Seven Justices in *Waters* agree that the *Connick* test should be applied to the facts as the employer reasonably found them to be. This important addition to the *Connick* test should be applied by this Court. We need not adopt the plurality opinion's suggested requirement for an investigation before an employee is terminated; indeed, in this case such a requirement is unnecessary as the record before us contains a report of the extensive and thorough investigation conducted by the City of Muskogee.[13]

*Waters* clearly indicates the trier of fact is to accept the facts as the employer reasonably found them to be. Given this directive I believe it is inappropriate for this Court to sua sponte determine from the record before us that the potential injury to the City of Muskogee Police Department outweighed Acedevo's interest in protected speech. Looking to the extensive record detailing the investigation undertaken by the City, I find that the City has amply demonstrated a reasonable belief that Acedevo's remarks were unprotected and the City would potentially suffer injury from his exercise of speech. For that reason I concur in the judgment.

---

**12.** *Waters*, 511 U.S. at ——, 114 S.Ct. at 1893, 128 L.Ed.2d at 706 (Souter, J., concurring).

**13.** I agree with Justice Opala's discussion of Acedevo's potential claims under our state constitution, and would adopt investigative procedures as suggested by the *Waters* plurality if the issue were properly before us.